**Debra CHAMPAGNE & Richard Champagne, as personal representatives of the Estate of Ricky Champagne, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

### Civ. No. A2–90–51.

United States District Court,
D. North Dakota,
Northeastern Division.

Aug. 4, 1992.

---

Alice R. Senechal, R. Raymond Sundling, Robert Vogel Law Office, P.C., Grand Forks, ND, for plaintiffs.

Lynn E. Crooks, U.S. Atty's Office, Fargo, ND, for defendant.

### MEMORANDUM & ORDER

WEBB, Chief Judge.

The parents of Ricky Champagne, as the personal representatives of his estate, bring this medical malpractice/wrongful death action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, and 1346(b). The plaintiffs allege that employees of the Indian Health Services (IHS) in Belcourt, North Dakota, were negligent in their care of Ricky Champagne following his suicide attempt on January 25, 1989, and that this negligence was a proximate cause of his later suicide on February 20, 1989. A bench trial was held on October 16–17, 1991. After considering the evidence presented at trial and the briefs submitted by the parties, the court concludes that IHS was negligent, that this negligence was a proximate cause of Ricky's death, but that the contributory fault of Ricky was greater than the fault of IHS, barring recovery under North Dakota law. *See* N.D.Cent. Code § 32–03.2–02.

## Findings of Fact

On February 20, 1989, Ricky Champagne, an eighteen year-old Native American male, died as a result of a self-inflicted gunshot wound to the chest. Ricky was the son of Richard and Debra Champagne, the plaintiffs in this case. Ricky had a fraternal twin, Nicky, a younger sister, Vicki, and a younger brother, Joe. Ricky was not close to his twin brother. While Nicky enjoyed outdoor activities like working on cars, Ricky enjoyed cooking and cleaning indoors. This created tension between Ricky and his father, and to some extent, the rest of the family as well. Richard sometimes accused Ricky of not being masculine and called him a "queer" or a "faggot." Evidently Ricky's mother shared her husband's sentiments, but may not have expressed her views as pointedly.

The months prior to Ricky's death reflect the life of a troubled young man. Ricky turned eighteen two months prior to his death. An eighteenth birthday marks a watershed in any person's life, signifying the beginning of adulthood and independence. It possibly has even more significance to a young Native American because they receive a lump sum payment of treaty money from the government at that time.

About a month before his eighteenth birthday, Ricky had a fight with his father. Testimony elicited at trial leads the court to believe that the fight represented a classic conflict between father and son as the latter struggles for his independence, and the father struggles to let go. Sometimes these conflicts are handled in a healthy manner, sometimes not. In this case, it appears that Richard resorted to brute force and intimidation. Whatever the reasons for the fight or its severity, Ricky filed a complaint with the police against his father for assault, and left home. He stayed with relatives, moving from one house to another, not wanting to be a burden to anyone.

After turning eighteen just before Christmas, Ricky received his treaty money and spent it on presents for his family and relatives, including his father; however, the rift between Ricky and his father remained unresolved. Ricky still did not return home after celebrating Christmas. At some time during this period, Ricky began to miss his classes at school. Testimony from his friend, Chad Trottier, indicates that Ricky became depressed and withdrawn.

On January 12, 1989, Ricky was seen at the hospital for a "cold, coughing up junk." Plaintiff's Exhibit 11, Outpatient Records at p. 1. An HIV test was done at Ricky's request. No one knows why Ricky requested the HIV test or whether Ricky thereafter knew the test was negative.

On January 25, 1989, at approximately 1:00 p.m., Ricky attempted suicide with an overdose of medication, and was admitted to the IHS Hospital in Belcourt, North Dakota. Treatment to stabilize Ricky's medical condition was provided by Dr. James Blain. Dr. Blain referred Ricky to the IHS mental health unit for treatment of his mental condition, and wrote an order for someone to see Ricky immediately. Ricky was not seen by someone from the mental health unit until the following day.

Lance Azure, a social service representative in the mental health unit, met with Ricky on January 26 for one to two hours. Azure is not a physician or psychologist, does not hold a college degree, but is an experienced and capable counselor. The written history of Ricky from that meeting is sketchy. Based on the limited history that was obtained, it is surmised by the experts who testified in the case that Ricky was suffering from an adolescent adjustment disorder with suicidal ideations. However, some of the experts could not rule out major depression. It was clear, however, from the medical records that do exist and from the testimony elicited at trial, that the conflict between Ricky and his father weighed heavily on Ricky's mind.

On January 27, Dr. Blain wrote an order that Ricky could be discharged upon Mental Health's approval. Ricky was discharged on Azure's approval the next day on the condition that he return to see Azure later that afternoon. Ricky and his mother returned to the hospital that afternoon, but did not locate Azure.

IHS did not schedule or provide any further counseling for Ricky after his discharge.

IHS did not refer Ricky for evaluation by, or consult with, a psychologist or psychiatrist.

Ricky returned home to live with his parents, but the tension between Ricky and his father remained unresolved. As is often the case, the subject of the suicide attempt was avoided. No counseling was provided the family in order to deal with the suicide attempt of a family member, or to resolve the conflicts in the family that may have led to the attempt.

On February 13, Debra went to see Azure and told him that her son had quit school again, had again moved away from home, and was giving away prized possessions, one of the classic signs of planned suicide. Azure responded to Debra's concerns by intimating that Ricky was eighteen, old enough to take care of himself and do what he wanted, and that Debra should not be concerned. However, Azure did attempt to contact Ricky, was unable to, and left a note at Ricky's· grandmother's house. ˙ He made no further attempts to contact Ricky.

A consulting psychologist, Dr. Simhai, was at the Belcourt IHS Hospital on February 14, the day after Debra reported to Azure that Ricky was exhibiting suicidal behavior. Dr. Simhai was not asked to review the case.

Ricky called Azure on February 16, 1989, and Azure asked Ricky if he would like to make an appointment for counseling. Ricky made an appointment for the next day, but did not keep it. After the missed appointment, Azure took no subsequent action to contact Ricky or to determine whether Ricky was suicidal. At this point in time, Ricky had essentially received no counseling or other form of treatment since his discharge from the hospital. Ricky shot himself three days later.

### Negligence of IHS

■ The standard of care applicable in this case is that which would be provided in the same or similar localities anywhere in the United States. *Winkjer v. Herr*, 277 N.W.2d 579, 583 (N.D.1979). IHS recognizes its duty to give care to suicide attempters in its written suicide protocol, which states, "[e]very person giving evidence of suicidal ideation or suicidal behavior should be offered appropriate counseling and/or referral services."

■ Several experts testified regarding the care given Ricky by IHS. Dr. David Sharbo, a psychiatrist practicing in Fargo, North Dakota, testified for the government. Dr. Byron Crouse, a family practitioner in Duluth, Minnesota; Dr. William Shore, a family practitioner in San Francisco, California; and Nelrene Little Bird, a licensed certified social worker in Grand Forks, North Dakota, testified for the plaintiffs. All the experts agreed that the care given Ricky by IHS fell below accepted standards of care in one or more respects.

Among the specifics identified by Dr. Sharbo as below acceptable standards of care were: 1) the failure to consult with Dr. Simhai on February 14; 2) Azure's failure to follow up when the February 17 appointment was missed; 3) lack of adequate history in determining whether the January 25 attempt was planned or impulsive, whether any significant relationships had ended recently, the extent of psychosocial support systems available, exploration of sexual identity as a possible problem, lack of a differential diagnosis, and exploration of possible substance abuse; 4) failure to establish a specific, structured follow-up plan including a contact person if Ricky had repeated thoughts of suicide, scheduled individualized counseling sessions, and family counseling; and 5) assignation of overall responsibility and discharge decision to Lance Azure.

Among the specifics identified by Dr. Crouse as problems were: 1) inadequate history and differential diagnosis, identifying the same deficiencies as Dr. Sharbo; 2) problems in division of authority between the physician, Dr. Blain, and the mental health unit; 3) unstructured discharge plan without specific dates for individual counseling sessions and family involvement; 4) discharge to care of parents without a parental conference, and appropriateness of discharge where relationship with father was clearly identified as a problem; 5) failure of physician to stay involved and oversee care of suicide patient, and at a minimum have a check-up for any delayed or late-occurring effects of medical ingestion; and 6) Azure's conduct regarding events from February 13 to February 17, specifically, not asking Ricky

if he was suicidal during February 16 phone call, leaving choice to Ricky if he wanted a counseling session, and lack of action after missed appointment on February 17. On the appropriateness of holding Ricky responsible to schedule counseling, Dr. Crouse said, "[Ricky] clearly had demonstrated, I think, what society would describe as bad judgment by attempting suicide and now giving him the authority to make good judgment seems to be hopeful at best." Crouse deposition at p. 23.

Among the specifics identified by Dr. Shore as below acceptable standards of care were: 1) deficient psychosocial and family history, again identifying the same problems as Drs. Sharbo and Crouse; 2) lack of specific discharge planning; 3) lack of twenty-four hour a day sitter during hospitalization; 4) inadequate action after February 13 contact with mother; and 5) inadequate action after missed appointment on February 17.

Nehrene Yellow Bird, who testified at trial, essentially shared the same concerns as the other experts.

The court determines that accepted standards of care required IHS to evaluate Ricky's risk of repeated suicide and obtain an adequate psychosocial history. In obtaining a history on Ricky, IHS failed to determine if Ricky had attempted suicide before and whether there was a family history of suicide. IHS failed to ask the reason for the attempt, and what Ricky's thoughts were at the time, whether the attempt was planned or impulsive, and whether there was a suicide note. IHS failed to obtain a history of use or abuse of alcohol or drugs, to develop a differential diagnosis, or to evaluate for possible treatment with anti-depressant medication, among other things.

IHS made the decision that counseling, rather than anti-depressant medication or commitment, was the appropriate treatment for Ricky. Given that, accepted standards of care required a specific, structured follow-up plan. The plan should have included, at a minimum, scheduled individual counseling sessions, family counseling sessions, identification of a person for Ricky to contact in the event he became suicidal, and a follow-up appointment with a physician to check on the stabilization of his medical condition after the

drug overdose. Instead, IHS shifted responsibility for follow-up care to the patient himself, to arrange additional counseling through the hospital, or to arrange his own counseling with the school. The testimony before the court establishes that the care given to Ricky was below accepted standards of care.

*Negligence of IHS as a Proximate Cause*

■ A proximate cause is a cause which, in natural and continuous sequence, produces the injury and without which the injury would not have occurred. It is a cause which had a substantial part in bringing about the injury either immediately or through happenings which follow one another.

■ All the experts agreed that, with appropriate intervention, it was more likely than not that Ricky's suicide would have been prevented. With appropriate treatment, most suicide attempters survive the crisis that produces suicidal preoccupation. In fact, the testimony indicated that only 1% of suicide attempters complete suicide within one year of the attempt. Successful treatment may not be the only reason for that statistic, and other factors may play a part; however, there is unquestionably a significant correlation between the treatment of suicide attempters and the prevention of subsequent, successful attempts.

The facts in this case show that Ricky's suicidal conditions went virtually untreated by IHS. Given the low number of suicide attempters that receive treatment but still go on to commit suicide, and the fact that Ricky did not receive appropriate treatment and did commit suicide, the court concludes that the plaintiffs have established by a preponderance of the evidence that the negligence of IHS was a proximate cause of Ricky's death.

*Contributory Fault*

Prior to trial, the government brought a motion for summary judgment on the ground that a deceased's intentional act of suicide breaks the line of causation between any other alleged negligence and the resulting death. The court denied the motion, holding that a health care provider's liability for the negligent care of a suicidal patient is not precluded as a matter of law solely on the

basis that suicide is an intentional act. *See* Order Denying Summary Judgment at docket entry #29. The United States now argues that even if the intentional act of suicide does not break the chain of causation as a matter of law, both Ricky and his parents were more at fault in causing Ricky's death than was IHS.

The court now faces an unenviable task. Having held that a health care provider may be liable for negligence in the care of suicidal patients, and having found that IHS was at fault and that such fault was a proximate cause of Ricky's death, the court must decide whether Ricky's parents contributed to cause his death, and what percentage of fault to attach to Ricky's intentional act of suicide.

█ In 1987, the North Dakota legislature adopted a new statutory framework governing tort liability. *See* N.D.Cent Code ch. 32-03.2. The new framework, in part, indicates a shift in focus from the traditional concepts of negligence, strict products liability, and intentional tort, to a singular, all-inclusive concept of "fault." *See Erickson v. Schwan*, 453 N.W.2d 765, 768 (N.D.1990). Under prior law, North Dakota barred recovery in a negligence action if the negligence of the person seeking recovery was as great as the negligence of the person against whom recovery was sought. N.D.Cent.Code § 9-10-07. The new legislation picks up this concept of comparative negligence, and expands it to apply to all fault.[1] Fault now includes what would have traditionally been considered intentional torts or intentional conduct. *See* N.D.Cent.Code § 32-03.2-03 ("Under this section, fault includes ... reckless or willful conduct.") Thus, under the law applicable to this action, there are many types of "fault" which the court must consider when comparing the fault of the parties. The court is not limited to simply comparing the negligence of both sides, but must consider all "fault." The contributory fault of Ricky and his parents is considered with this statutory framework in mind.

█ After having carefully reviewed the evidence in the record and the arguments of both counsel, the court finds no evidence that Debra Champagne was at fault in causing her son's death. However, the medical records of IHS do indicate that Richard's verbal abuse of Ricky, and the November fight between Ricky and his father, were precipitating factors in Ricky's depression and initial suicide attempt. Drs. Sharbo, Crouse, and Shore all identified the relationship with Ricky's father as a central factor in Ricky's adjustment disorder. *See, e.g.,* Shore deposition at pp. 26-27; Sharbo deposition at p. 71; Crouse deposition at pp. 49-50. Ricky's mother testified that when Ricky was visiting with her in the hospital following his suicide attempt, Ricky told her he was hurt deeply by his father's actions. The record also indicates that, following the suicide attempt, Richard took no steps to reconcile with his son. The court concludes that Ricky's problems with his father were a contributing factor in his death.

However, after having considered the percentage of fault attributable to IHS, and the percentage of fault attributable to the father/son relationship, the court finds that this fault combined still does not approach 50% of the total fault that contributed to Ricky's death. Therefore, because the statutory framework at chapter 32-03.2 of the North Dakota Century Code contemplates that all fault including intentional acts must be considered, the court finds that Ricky bears the ultimate and primary responsibility for his own death.

The plaintiffs may argue that Ricky should not be held accountable for his own conduct. Due in part to the negligence of IHS, there is scant evidence of Ricky's mental condition in the days immediately preceding his demise. However, Ricky's suicide note provides some evidence of his state of mind near the time of his death. The note says in part:

> I'm really sorry that I have to leave like this, but, I think its best for me. It may not seem like I have problems but I do, its so hard to talk about. Everything seems like its coming so fast and I didn't know what to do.

Plaintiff's Exhibit 2. At the least, the note indicates that Ricky's death was a planned

---

1. To be clear, the new law provides for pure comparative fault in a products liability case.

*See* N.D.Cent.Code § 32-03.2-03.

and intentional act. Thus, even though IHS failed to treat Ricky, in the final analysis it was Ricky who chose to take his own life and who must bear ultimate responsibility for his own death.

*Decedent's Fault Attributed to Plaintiffs*

■ Under traditional concepts of negligence, the contributory negligence of a decedent was attributed to those who brought a wrongful death action on his/her behalf. *See, e.g., Krise v. Gillund*, 184 N.W.2d 405, 407 (N.D.1971). Likewise, under the new "fault" concept adopted by the North Dakota legislature, there is no reason why the contributory fault of a decedent should not be attributed to those who bring suit on his/her behalf in the same manner. Because the court finds that Ricky's intentional act of suicide is the primary proximate cause of his death, and because that conduct is attributable to his parents, recovery is barred.

Therefore, it is the finding and order of this court that the United States is entitled to a judgment in its favor.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**