Debra **CHAMPAGNE** and Richard **Champagne**, as personal representatives of the Estate of Ricky Champagne, Plaintiffs and Appellants,

v.

**UNITED STATES of America,**
**Defendant and Appellee.**

Civ. No. 930215.

Supreme Court of North Dakota.

March 8, 1994.

Robert Vogel Law Office, P.C., Grand Forks, for plaintiffs and appellants; argued by Alice R. Senechal.

Sushma Soni (argued), Appellate Staff, Civ. Div., U.S. Dept. of Justice, Washington, DC and Cameron W. Hayden (appearance), Asst. U.S. Atty., U.S. Attorney's Office, Fargo, for defendant and appellee.

MESCHKE, Justice.

We consider the effect of comparative fault on a medical provider's tort liability for treating a patient with suicidal ideas when the patient commits suicide. Under NDRAppP 47 the United States Court of Appeals for the Eighth Circuit certified questions of law to this court:

(1) Is a suicide victim's fault to be considered under North Dakota's Comparative Fault Statutes, § 32–03.2–01 and 02; and

(2) Is any fault of the suicide victim attributable to the plaintiffs Debra Champagne and Richard Champagne who are the parents and surviving heirs of the suicide victim and institute this action as personal representatives of the estate of their deceased son.

■ Our answer to the first question is yes. A suicide victim's fault is considered under NDCC 32–03.2–02. But, if the medical provider, knowing the patient is suicidal and too mentally incapacitated to assume responsibility for his own well-being, undertakes a duty of care to the patient that takes in the patient's duty of self care, then the patient's fault in the act of suicide is greatly reduced. If the patient's act of suicide is a foreseeable result of the medical provider's breach of duty to treat the patient, the patient's act of suicide cannot be deemed a superseding

cause of the patient's death that breaks the chain of causation between the medical provider and the patient, which absolves the medical provider of liability.

Our answer to the second question is that the fault of a suicide victim is attributable to plaintiffs who sue for wrongful-death damages.

For its statement of facts, the Circuit Court of Appeals used two memorandum opinions by the federal district court. We quote relevant parts:

> The parents of Ricky Champagne, as the personal representatives of his estate, bring this medical malpractice/wrongful death action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, and 1346(b). The plaintiffs allege that employees of the Indian Health Services (IHS) in Belcourt, North Dakota, were negligent in their care of Ricky Champagne following his suicide attempt on January 25, 1989, and that this negligence was a proximate cause of his later suicide on February 20, 1989.

> \* \* \* \* \* \*

> On February 20, 1989, Ricky Champagne, an eighteen year-old Native American male, died as a result of a self-inflicted gunshot wound to the chest.

> \* \* \* \* \* \*

> The months prior to Ricky's death reflect the life of a troubled young man. Ricky turned eighteen two months prior to his death.

> \* \* \* \* \* \*

> On January 25, 1989, at approximately 1:00 p.m., Ricky attempted suicide with an overdose of medication, and was admitted to the IHS Hospital in Belcourt, North Dakota. Treatment to stabilize Ricky's medical condition was provided by Dr. James Blain. Dr. Blain referred Ricky to the IHS mental health unit for treatment of his mental condition, and wrote an order for someone to see Ricky immediately. Ricky was not seen by someone from the mental health unit until the following day.

> Lance Azure, a social service representative in the mental health unit, met with Ricky on January 26 for one to two hours. . . . Based on the limited history that was obtained, it is surmised by the experts who testified in the case that Ricky was suffering from an adolescent adjustment disorder with suicidal ideations. However, some of the experts could not rule out major depression. . . . [T]he conflict between Ricky and his father weighed heavily on Ricky's mind.

> On January 27, Dr. Blain wrote an order that Ricky could be discharged upon Mental Health's approval. Ricky was discharged on Azure's approval the next day on the condition that he return to see Azure later that afternoon. Ricky and his mother returned to the hospital that afternoon, but did not locate Azure.

> IHS did not schedule or provide any further counseling for Ricky after his discharge. IHS did not refer Ricky for evaluation by, or consult with, a psychologist or psychiatrist.

> Ricky returned home to live with his parents, but the tension between Ricky and his father remained unresolved. As is often the case, the subject of the suicide attempt was avoided. No counseling was provided the family in order to deal with the suicide attempt of a family member, or to resolve the conflicts in the family that may have led to the attempt.

> On February 13, Debra went to see Azure and told him that her son had quit school again, had again moved away from home, and was giving away prized possessions, one of the classic signs of planned suicide. Azure responded to Debra's concerns by intimating that Ricky was eighteen, old enough to take care of himself and do what he wanted, and that Debra should not be concerned. However, Azure did attempt to contact Ricky, was unable to, and left a note at Ricky's grandmother's house. He made no further attempts to contact Ricky.

> \* \* \* \* \* \*

> Ricky called Azure on February 16, 1989, and Azure asked Ricky if he would like to make an appointment for counseling. Ricky made an appointment for the next

day, but did not keep it. After the missed appointment, Azure took no subsequent action to contact Ricky or to determine whether Ricky was suicidal. At this point in time, Ricky had essentially received no counseling or other form of treatment since his discharge from the hospital. Ricky shot himself three days later.

\* \* \* \* \* \*

IHS recognizes its duty to give care to suicide attempters in its written suicide protocol, which states, "[e]very person giving evidence of suicidal ideation or suicidal behavior should be offered appropriate counseling and/or referral services."

\* \* \* \* \* \*

The testimony before the court establishes that the care given to Ricky was below accepted standards of care.

\* \* \* \* \* \*

All the experts agreed that, with appropriate intervention, it was more likely than not that Ricky's suicide would have been prevented.

\* \* \* \* \* \*

[T]he court concludes that the plaintiffs have established by a preponderance of the evidence that the negligence of IHS was a proximate cause of Ricky's death.

\* \* \* \* \* \*

The court concludes that Ricky's problems with his father were a contributing factor in his death.

However, after having considered the percentage of fault attributable to IHS, and the percentage of fault attributable to the father/son relationship, the court finds that this fault combined still does not approach 50% of the total fault that contributed to Ricky's death. Therefore, because the statutory framework at chapter 32–03.2 of the North Dakota Century Code contemplates that all fault including intentional acts must be considered, the court finds that Ricky bears the ultimate and primary responsibility for his own death.

\* \* \* \* \* \*

... Ricky's suicide note provides some evidence of his state of mind near the time of his death.... At the least, the note indicates that Ricky's death was a planned and intentional act. Thus, even though IHS failed to treat Ricky, in the final analysis it was Ricky who chose to take his own life and who must bear ultimate responsibility for his own death.

\* \* \* \* \* \*

Because the court finds that Ricky's intentional act of suicide is the primary proximate cause of his death, and because that conduct is attributable to his parents, recovery is barred.

See Champagne v. U.S., 836 F.Supp. 684 (D.C.N.D.1992), for further details.

This case asks us to decide how a patient's act of suicide should be compared with the fault of a medical provider who, knowing about the patient's propensity to commit suicide, fails to provide reasonable medical care. A medical provider treating a patient with suicidal ideas presents a uniquely complex situation for comparative fault. The Illinois Court of Appeals in Peoples Bank of Bloomington v. Damera, 220 Ill.App.3d 1031, 163 Ill.Dec. 475, 478, 581 N.E.2d 426, 429 (1991), cert. denied, 143 Ill.2d 648, 167 Ill.Dec. 409, 587 N.E.2d 1024 (1992), concluding that the patient-suicide victim's fault should not be compared, summarized the uniqueness of the situation:

[T]his case is different than the typical medical malpractice case because plaintiff here alleges medical malpractice by a psychiatrist treating a suicidal patient who ultimately committed suicide. The critical distinction between this case and all other medical malpractice cases is that here the patient does not share the goal of his physician of getting better; while the doctor is working to assist the patient to suppress suicidal tendencies, the patient, by the nature of his illness, may be working at cross-purposes to his doctor's suggestions and may not be interested in following instructions designed to enable him or her to safely take prescribed medication.

Because the act of suicide evidences that the course of treatment failed, there are difficulties in comparing the effects of a mental

illness to reasonableness of the medical treatment.

In 1987, the Legislature enacted NDCC Ch. 32–03.2, and thereby shifted the focus for determining tort liability from traditional doctrinal categories to the singular, inclusive concept of "fault." *See Erickson v. Schwan,* 453 N.W.2d 765 (N.D.1990). In constructing this modified comparative fault system, the Legislature expressly combined a wide range of conduct, including willful conduct, for comparison in assessing liability for tort:

> Contributory fault does not bar recovery in an action by any person to recover damages for death or injury to person or property unless the fault was as great as the combined fault of all other persons who contribute to the injury, but any damages allowed must be diminished in proportion to the amount of contributing fault attributable to the person recovering.... Under this section, *fault includes* negligence, malpractice, absolute liability, dram shop liability, failure to warn, *reckless or willful conduct,* assumption of risk, misuse of product, *failure to avoid injury,* and product liability, including product liability involving negligence or strict liability or breach of warranty for product defect.

NDCC 32–03.2–02 (emphasis added). "Fault" now includes an intentional act.

While suicide is an intentional act, *Falkenstein v. City of Bismarck,* 268 N.W.2d 787 (N.D.1978), a suicidal patient often suffers from a mental illness that diminishes the patient's ability to act reasonably for self-protection and well-being. NDCC 25–03.1–02(10) says: " 'Mentally ill person' means an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations." NDCC 25–03.1–02(11) says: " 'Person requiring treatment' means a person who is mentally ill ... and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property. 'Serious risk of harm' means a substantial likelihood of: (a) Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal poten-

tial...." In NDCC Ch. 25–03.1, the Legislature has developed elaborate procedures intended to "[p]rovide prompt evaluation and treatment of persons with serious mental disorders ...," to "[s]afeguard individual rights," and to "[p]rovide continuity of care for persons with serious mental disorders...." While this chapter is primarily concerned with involuntary treatment of seriously mentally ill persons, it affords a frame of reference for analyzing comparative fault in the treatment of mental illness.

Still, a mentally ill patient often retains some capacity to protect himself from harm, even though diminished. And, medical providers are not insurers; their duty is to act reasonably under the circumstances of each case.

Here, Ricky's first suicide attempt put everyone on notice that he needed treatment. Yet the trial court did not find that Ricky's condition left him totally incapacitated or entirely incapable of being responsible for himself in an out-patient setting. The court concluded that Ricky's death was a planned and intentional act and that Ricky bore most of the responsibility for it. Although the court did not discuss the extent that Ricky's mental capacity was diminished, its findings imply that Ricky retained enough mental capacity to be responsible for his own well-being. In such circumstances, NDCC 32–03.2–02 directs comparison of the victim's "fault" with the negligent care he received from the medical-care defendant.

■ Comparison of fault between a suicide victim and a defendant, who has a duty of medical care toward that victim, is generally for the trier of fact. *See Lather v. Beadle County,* 879 F.2d 365 (8th Cir.1989); *Molton v. City of Cleveland,* 839 F.2d 240, 247–248 (6th Cir.1988); *Hickey v. Zezulka,* 439 Mich. 408, 487 N.W.2d 106, 123–124 (1992) (controlling opinion); *Brandvain v. Ridgeview Institute, Inc.,* 188 Ga.App. 106, 372 S.E.2d 265 (1988). In *Hickey* a father sued for the wrongful death of his son who committed suicide while in the custody of university officials when under arrest for driving under the influence of alcohol. In a divided opinion, the majority of the Michigan Supreme Court concluded that the trial court erred in

failing to give an instruction on comparative fault:

> The assumption of a duty to protect the decedent while in defendant's custody merely establishes a legal basis for holding defendant negligent. The mere existence of a duty does not automatically lead to the conclusion that the decedent's fault should not be considered.
>
> \*   \*   \*   \*   \*   \*
>
> Jurors are capable of reaching a rational and sensible balance between the decedent's fault and the negligent jailers fault.... With the proper instruction, a jury will not necessarily preclude recovery for the plaintiff by finding the plaintiff one hundred percent at fault because of his intentional act of suicide. An instruction on comparative fault is necessary to apportion the damages between two parties responsible for the injury.

*Hickey,* 487 N.W.2d at 123–124. Comparison of fault apportions the responsibility for a suicide.

We are not persuaded by the Champagnes' argument that, when a patient's act of suicide is a foreseeable result of a medical provider's failure to treat reasonably to prevent the suicide, it is never appropriate to compare the victim's act of suicide with the medical provider's fault. Rather, if the evidence shows that the patient is incapable of being responsible for his own care and that the medical provider has undertaken the duty of care for the patient's well-being, there would be no allocation of fault to the patient. *Tomfohr v. Mayo Foundation,* 450 N.W.2d 121 (Minn.1990); *Cowan v. Doering,* 111 N.J. 451, 545 A.2d 159 (1988). If the medical provider has taken on the duty of caring for a patient with a diminished capacity, and if the patient is capable of being responsible for his own care, allocation of fault is in order.

In *Tomfohr* the Minnesota Supreme Court concluded that the fault of a patient-suicide victim, who "lacked the capacity to be responsible for his own well-being" should not be compared with the fault of the hospital that was caring for him when he committed suicide. The court explained the scope of its holding:

> [T]his ruling is limited to the type of factual situation presented by this case, to-wit, an attempted suicide committed by a mentally ill patient admitted to a locked hospital ward where the medical staff was aware of his suicidal ideations. Our decision in this case should not be construed as a *per se* rejection of a capacity-based comparative fault standard in other factual situations. Rather, somewhat similar to, and consistent with the analysis applied in cases involving the comparative fault of small children, our holding today only stands for the proposition that cases may exist, such as this one, where a trial judge may rule, as a matter of law, that the patient could not be at fault because he lacked the capacity to be responsible for his own well being, and that the obligation of self care was transferred to the health care provider when it admitted the patient into its care.

*Tomfohr,* 450 N.W.2d at 125. If the patient's capacity for self care is so diminished by mental illness that it is lacking, we agree that an allocation of fault is not appropriate.

In like situation, the Supreme Court of New Jersey in *Cowan* concluded that the attempted suicide of a patient could not be compared with the fault of the hospital, because the patient was so mentally disturbed and her suicidal tendencies so symptomatic of her incapacitated condition that the patient's duty of care for herself was "subsumed" within the hospital's duty to protect her. The court explained:

> The plaintiff's inability adequately to control her self-damaging behavior—which indeed was symptomatic of her mental disturbance—was known to the defendants, and the defendants were under a duty to prevent plaintiff's self-damaging acts.

*Cowan,* 545 A.2d at 166–167. Comparison of fault thus depends on the factual extent of the patient's diminished mental capacity.

In this case, Ricky was not kept in the custody of IHS. The federal district court made no specific findings on whether he should have been, or on whether Ricky was so incapacitated in handling his own affairs

that his care was within IHS's duty to provide. If Ricky was not incapacitated, it was proper for the trial court to compare Ricky's fault with IHS whose conduct certainly contributed to his untimely death. Of course, under NDCC 32–03.2–02, contributory fault does not ban recovery unless the contributory fault is as great as the combined fault of all other persons who contributed to the injury.

■ In making the fault comparison, the factfinder should always take into account the extent of the patient's diminished mental capacity to care for his own safety. *Miller v. Trinity Medical Center*, 260 N.W.2d 4 (N.D. 1977). *Compare Ruehl v. Lidgerwood Rural Telephone Co.*, 23 N.D. 6, 135 N.W. 793, 796 (1912) ("It is well established . . . that a child 3½ years of age cannot be made chargeable with contributory negligence."); *Schweitzer v. Anderson*, 83 N.W.2d 416, 420 (N.D.1957) ("A child can only be held to that degree of care which ordinarily prudent children of its age and experience are wont to use under like circumstances."). A mentally ill person can only be held to the degree of care that his diminished capacity permits. The worse the suicidal patient's diminished capacity, the greater the medical provider's responsibility.

■ Moreover, when a patient's suicide is a foreseeable consequence of the medical provider's negligent care, the act of suicide cannot be deemed a superseding intervening cause. *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 11 Cal.Rptr.2d 468, 482–483 (1992). *See also First Trust Company v. Scheels Hardware*, 429 N.W.2d 5, 8–9 (N.D.1988). To relieve a defendant of the responsibility for the consequences of his negligence, an intervening cause must be one that is both independent and unforeseeable. *Lang v. Wonnenberg*, 455 N.W.2d 832, 837 (N.D.1990). If Ricky's act of suicide was a reasonably foreseeable consequence of IHS's failure to provide reasonable medical care, then Ricky's suicide cannot be a superseding cause that entirely absolves IHS from responsibility by breaking the legal chain of causation.

■ The second certified question asks whether a decedent's fault is attributed to the persons suing an alleged tortfeasor for the wrongful death of the decedent. Our answer is yes.

Before adoption of our comparative fault law, contributory negligence of the deceased barred recovery by a survivor of the decedent who sued for damages for the wrongful death. *See Krise v. Gillund*, 184 N.W.2d 405 (N.D.1971). Without addressing this specific question, we have upheld judgments that applied the more recent comparative-fault law and that attributed the decedent's fault to the wrongful-death plaintiffs. *Erickson v. Schwan*, 453 N.W.2d 765 (N.D.1990); *Weisenberger v. Senger*, 381 N.W.2d 187 (N.D. 1986). The reason for attributing a decedent's fault to plaintiffs suing for the wrongful death is found in NDCC 32–21–01, which allows recovery only when the wrongful act "would have entitled the party injured, if death had not ensued, to maintain an action and recover damages in respect thereof. . . ." This is consistent with other jurisdictions that have comparative-fault laws, according to W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 127, at p. 955 (5th Ed.1984) that summarizes the general rule:

> Under comparative negligence statutes, contributory fault of the decedent will be given the same effect in the death action as it would have had in a personal injury claim, normally to reduce damages.

*See also Anderson v. Gailey*, 97 Idaho 813, 555 P.2d 144, 153–154 (1976). A decedent's comparative fault is attributed to the claimants suing for the wrongful death.

· The Champagnes argue that a decedent's fault should not be attributed to the plaintiffs in a wrongful death action because, under NDCC 32–03.2–02, damages are reduced only in proportion to the fault "attributable to the person recovering." They argue that, because the section does not expressly refer to fault attributable to the person "or his legal representative," a decedent's fault cannot be attributed to the plaintiffs suing for his wrongful death. We disagree. NDCC 32–21–01 is not ambiguous. It permits recovery in a wrongful death action only if the decedent could have recovered in a personal injury action. Construing that provision together with NDCC 32–03.2–02, the dece-

dent's fault is "attributable" to the wrongful-death plaintiffs, and damages are diminished in proportion to the contributing fault of both the plaintiffs, if any, and the decedent.

CERTIFIED QUESTIONS ANSWERED.

VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.