2001 ND 139

## Clifton RODENBURG and Donna Rodenburg, Plaintiffs and Appellants,

v.

## FARGO–MOORHEAD YOUNG MEN'S CHRISTIAN ASSOCIATION, and Patrick Parker, Defendants and Appellees,

and

## William J. Hart, Mark Lathrop and Amelia Oponski, Defendants.

### No. 20000279.

Supreme Court of North Dakota.

July 23, 2001.

Rehearing Denied Sept. 5, 2001.

Clifton Rodenburg (argued), pro se, Fargo, ND, for plaintiffs and appellants.

Calvin N. Rolfson (appeared), Rolfson Schulz Lervick & Geiermann Law Offices, Bismarck, ND, for plaintiffs and appellants.

Duane H. Ilvedson (argued) and Joel M. Fremstad (on brief), Nilles, Hansen & Davies, Ltd., Fargo, ND, for defendant and appellee Fargo–Moorhead Young Men's Christian Association.

Aaron J. Dorrheim (argued) and Thomas R. Olson (on brief), Jeffries, Olson & Flom, PA, Moorhead, MN, for defendant and appellee Patrick Parker.

KAPSNER, Justice.

[¶ 1]   Clifton and Donna Rodenburg appealed a district court judgment, an order denying their motion for a new trial, and "every other ruling of the court adverse to the plaintiffs."  We reverse the judgment dismissing Rodenburgs' action against Patrick Parker.  We affirm in all other respects.

[¶ 2]   While in the weight room of the Fargo–Moorhead Young Men's Christian Association ("YMCA") on March 26, 1996,

Clifton Rodenburg was injured when William J. Hart shot him with a .357 magnum revolver. Rodenburgs sued Hart for damages. In an amended complaint, Rodenburgs added the YMCA as a defendant, alleging in part: "The YMCA negligently failed to take reasonable measures to prevent Hart from gaining access to the YMCA and negligently failed to take reasonable precautions to provide for the safety of the YMCA's patrons, including Clifton Rodenburg." In a second amended complaint, Rodenburgs added Mark Lathrop, Amelia Oponski, and Patrick Parker as defendants. Rodenburgs alleged:

32. Lathrop and Oponski, in breach of this duty, negligently and carelessly:

a. obtained Hart's release from jail by posting bail for him,

b. allowed Hart to possess the .357 magnum revolver that was in their possession,

c. transported Hart to Fargo, and

d. failed to warn the authorities and/or Clifton Rodenburg of Hart's risk of assault upon Clifton Rodenburg and others.

33. By breach of their duty, Lathrop and Oponski aided, enabled, and facilitated Hart's assault and battery of Clifton Rodenburg.

Rodenburgs alleged Parker owned the revolver and ammunition Hart used to shoot Clifton Rodenburg and alleged:

41. Parker, in breach of this duty, negligently and carelessly entrusted his .357 magnum revolver and ammunition to be used in an enterprise where Clifton Rodenburg was shot with this firearm and ammunition by Hart.... Parker, by providing the .357 magnum revolver and ammunition, aided, enabled, and facilitated Hart's shooting of Rodenburg.

[¶ 3] Rodenburgs moved for partial summary judgment striking part of the YMCA's answer, "on the grounds that, under North Dakota comparative fault law, liability may not be apportioned between an intentional tortfeasor ... and a negligent tortfeasor ... whose liability is predicated upon breaching a duty to protect, when both are proximate causes of an indivisible injury." The court denied Rodenburgs' motion and their subsequent motion for reconsideration.

[¶ 4] Rodenburgs moved to strike the part of Parker's answer alleging the trial court lacked personal jurisdiction over him. The trial court denied Rodenburgs' motion to strike, and Parker moved to dismiss the action against him because the court lacked personal jurisdiction. The trial court found "the contacts of defendant Patrick Parker with the State of North Dakota are so minimal such that the exercise of jurisdiction over him in the State of North Dakota offends traditional notions of fair play and substantial justice" and granted Parker's motion to dismiss on May 19, 1999. On June 16, 1999, this Court denied Rodenburgs' application for a supervisory writ.[1] Upon Rodenburgs' motion, the trial court ordered their action against Lathrop and Oponski dismissed without prejudice.

[¶ 5] After a trial, the jury returned a special verdict finding the YMCA was not negligent, attributing to Hart 100% of the fault proximately causing damages to Rodenburgs, and fixing the amount of damages to Rodenburgs. Judgment against Hart and dismissing Rodenburgs' com-

---

1. This Court's decision to decline to exercise its discretionary authority to issue an original or remedial writ without an opinion is not an indication of our position on the merits of the issues presented. *State v. Paulson*, 2001 ND 82, ¶ 6 n. 1, 625 N.W.2d 528; *Daley v. American Family Mut. Ins. Co.*, 355 N.W.2d 812, 814 n. 2 (N.D.1984).

plaint against the YMCA was entered on June 1, 2000. The court denied Rodenburgs' motion for a new trial on the grounds of erroneous exclusion of evidence, erroneous jury instructions, and on the ground that the jury's verdict was contrary to the weight of the evidence. Rodenburgs appealed.

## I

[¶ 6] Rodenburgs contend: "The Jury's Verdict That the YMCA Was Not Negligent Is Clearly Contrary to the Evidence, and the Trial Court's Denial of the New Trial Motion Was an Abuse of Discretion." Rodenburgs contend the evidence shows "the YMCA failed to take the most basic steps to protect its members in the face of a clear and substantial risk of harm."

[¶ 7] We uphold special verdicts whenever possible and set aside a special verdict only if it is perverse and clearly contrary to the evidence. *Phillips v. Dickinson Mgmt., Inc.*, 1998 ND 123, ¶ 6, 580 N.W.2d 148. In reviewing a jury's findings, "we view the evidence in the light most favorable to the verdict and determine only if substantial evidence supports it." *Ingalls v. Paul Revere Life Ins. Group*, 1997 ND 43, ¶ 24, 561 N.W.2d 273. A motion for a new trial under N.D.R.Civ.P. 59(b)(6) is addressed to the sound discretion of the trial court. *Braunberger v. Interstate Eng'g, Inc.*, 2000 ND 45, ¶ 7, 607 N.W.2d 904. "A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner." *Id.* In reviewing a trial court's decision on a motion for a new trial based on insufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine if there is sufficient evidence to justify the verdict. *Kreidt v. Burlington Northern R.R.*, 2000 ND 150, ¶ 19, 615 N.W.2d 153.

[¶ 8] Rodenburgs rely on several evidentiary items supporting their argument the YMCA knew of a risk of harm Hart posed to Clifton Rodenburg and failed to take reasonable steps to protect him from Hart. There was evidence, however, supporting the YMCA's argument it acted reasonably under the circumstances in light of its knowledge about Hart. The trial court observed in considering Rodenburgs' motion for new trial, "[t]he evidence in this case was extremely close on the question of negligence."

[¶ 9] Paul Finstad, the executive director of the YMCA, testified: (1) in a telephone conversation on February 22, 1996, Rodenburg told him Hart "had been exhibiting some bizarre behavior, that at times he could be very friendly, and sometimes he could be very difficult. I believe he also told me that he had thrown a weight at him," and that Ed Renner and Bill Engelhardt "also had concerns about" Hart, and Rodenburg encouraged Finstad to consider taking away Hart's membership; (2) he did not recall Rodenburg telling him Hart threatened to kill Rodenburg; (3) in that conversation, Finstad told Rodenburg, "before I make a decision on what we needed to do, I wanted to be able to try and talk to both parties in regard to what had happened;" (4) he could suspend or revoke a member's privileges, which could be flagged on the computer; and (5) on March 26, 1996, there were no flags or restrictions on Hart's membership. Finstad testified if he "would kick somebody out of the Y every time a member … would come in and tell me they should be kicked out, boy, that's—I could be doing that full time" and that, when he learns a member has threatened or assaulted another member, he will usually try "to first visit with both parties and hear both sides of the story." Finstad testified: (1) he talked to Renner and Engelhardt after he talked to Rodenburg on February 22; (2)

he called the Sioux Falls Y, where Hart had been a member, and learned they had no problems with Hart; (3) on February 22 he talked to Maurice Brandt of the Fargo police department, who said "we should be careful in dealing with a person like this, and that, you know, we pursue it with a common sense approach;" and (4) he tried to call Hart, but his phone was disconnected. Finstad further testified: (1) on February 22, the sheriff's department said Hart was going to be arrested; (2) he knew Hart had been arrested February 23 and extradited to Iowa on February 28; (3) he thought the situation was taken care of when Hart was arrested and thinks that was Rodenburg's understanding, too; (4) no member who worked out when Hart was there ever complained to him about Hart before Rodenburg did; (5) he did not recall Rodenburg telling him Hart had aggravated assault charges against him; (6) he did not know Rodenburg had sued Hart the day Hart was extradited; (7) he did not feel Hart was a serious threat to Rodenburg; and (8) after the shooting, he talked to Rodenburg in the hospital and "Rodenburg indicated to me that he knew [Hart] was out of prison, but that he certainly didn't expect him to do something like this."

[¶ 10] Maurice Brandt, a Fargo police officer since 1973, testified that, before the shooting, he had a telephone conference with Finstad about what to do about a man intimidating others in the weight room. He testified about what to do in such a case:

> Certainly, when someone calls with a problem like Mr. Finstad indicated he had, we usually ask them if—first of all, does the person who's supposedly causing the problems ... aware that there is a problem. And the only way to make sure that's done is to speak to them and tell them that there has been a complaint about them, tell them what the

complaint is. Then you need to let them know that they can't continue along that line and there will be consequences if they do. That's a pretty standard way to handle that.

[¶ 11] From our review of the evidence in the light most favorable to the verdict, we conclude there is substantial evidence supporting the verdict and the trial court did not abuse its discretion in denying Rodenburgs' motion for new trial on the ground of insufficiency of the evidence to sustain the verdict.

## II

[¶ 12] The July 9, 1999, judgment dismissing Parker specified it was without prejudice. Because either side may commence another action, a dismissal without prejudice is ordinarily not appealable. *Runck v. Brakke,* 421 N.W.2d 487, 488 (N.D.1988). However, a dismissal without prejudice may be final and appealable if the plaintiff cannot cure the defect that led to dismissal, *Lopez v. City of Needles,* 95 F.3d 20, 22 (9th Cir.1996), or if the dismissal has the practical effect of terminating the litigation in the plaintiff's chosen forum, *Triple Quest, Inc. v. Cleveland Gear Co.,* 2001 ND 101, ¶¶ 8–10, 627 N.W.2d 379. Here, the trial court's judgment effectively forecloses litigation in the courts of this state. The dismissal is, therefore, appealable.

[¶ 13] Rodenburgs contend the trial court improperly held it lacked personal jurisdiction over Parker. Parker contends the trial court properly concluded it lacked personal jurisdiction over him. Parker and the YMCA both contend Rodenburgs may not now raise the issue because they did not raise it in their motion for new trial.

[¶ 14] We have held a party who moves for a new trial is restricted on

appeal to the issues raised in the motion for new trial. *Paxton v. Wiebe*, 1998 ND 169, ¶ 26, 584 N.W.2d 72; *Andrews v. O'Hearn*, 387 N.W.2d 716, 728 (N.D.1986). "A new trial is a reexamination of an issue of fact in the same court, after a trial and decision by a jury or court or by a referee." N.D.R.Civ.P. 59(a). Parker was dismissed before trial. Thus, as in *Berg v. Burke*, 77 N.D. 913, 918, 46 N.W.2d 786, 789 (1951), "there has never been an examination of an issue of fact between" Rodenburgs and Parker. When a party has been dismissed before trial and a trial is held with the remaining parties, the trial court's action in dismissing one of the parties before trial is "not a proper ground for a motion for a new trial." *Id.* Thus, we are not persuaded decisions like *Paxton* and *Andrews* preclude Rodenburgs from raising the issue in this appeal.

[¶ 15]  In determining if it has personal jurisdiction, a court must first determine if "the forum state's long-arm statute confers jurisdiction over the non-resident defendant," and, if it does, the court must determine if "the exercise of personal jurisdiction over the non-resident defendant comports with due process." *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 225 (8th Cir.1987). For a court to exercise personal jurisdiction over a nonresident defendant, the defendant must have such minimum contacts with the forum state that maintenance of a suit against that defendant would not offend traditional notions of fair play and substantial justice. *Guinness Import Co. v. Mark VII Distributors, Inc.*, 153 F.3d 607, 614 (8th Cir.1998).

[¶ 16]  Rule 4(b), N.D.R.Civ.P., provides, in part:

(2) Personal Jurisdiction Based Upon Contacts.  A court of this state may exercise personal jurisdiction over a person who acts directly or by an agent as to any claim for relief arising from the person's having such contact with this state that the exercise of personal jurisdiction over the person does not offend against traditional notions of justice or fair play or the due process of law, under one or more of the following circumstances:

. . . .

(C) committing a tort within or without this state causing injury to another person or property within this state. . . .

Thus, our long-arm provision is broad enough to provide jurisdiction over nonresidents.

[¶ 17]  Whether a court maintains personal jurisdiction over a party is a question of law. *LSI Indus. Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1371 (Fed.Cir.2000). The standard of review applicable to district court decisions regarding personal jurisdiction is clear error for factual findings and de novo for legal conclusions. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 151 (2d Cir.2001). "To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir.1991). "If the district court does not hold a hearing and instead relies on pleadings and affidavits, as it did here, the court must look at the facts in the light most favorable to the nonmoving party." *Id.*[2]

**2.**  Here, the court held a hearing to allow the parties to present their jurisdictional arguments, but did not take evidence. If an evidentiary hearing is held, the burden is on the party asserting jurisdiction. *Red River Transp. & Dev. Co. v. Custom Airmotive, Inc.*, 497 F.Supp. 425, 427 (D.N.D.1980).

[¶ 18] Foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause, and a state may not exercise in personam jurisdiction over a nonresident based on one isolated fortuitous circumstance. *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). "[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. 559. The fact that only the injury occurred within a state does not preclude that state's courts from subjecting a nonresident to their jurisdiction. *Tavoularis v. Womer*, 123 N.H. 423, 462 A.2d 110, 112 (1983). When a resident of one state loans another person an automobile for use in another state, courts have held an injury in that state is not fortuitous, the loaner reasonably should anticipate being brought into court in the injury state, and the entrustment satisfies the constitutional minimum contacts requirement for the courts in the injury state to exercise personal jurisdiction over the person who loaned the automobile. *Tavoularis*, 462 A.2d at 113–14; *Hart v. Bates*, 897 F.Supp. 710, 715 (E.D.N.Y.1995).

[¶ 19] In other contexts, as well, nonresidents' actions have been held to provide a state's courts with personal jurisdiction over nonresidents. Persons whose "intentional, and allegedly tortious, actions were expressly aimed at California ... must 'reasonably anticipate being haled into court there.'" *Calder v. Jones*, 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (quoting *World Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559). "We hold that jurisdiction over petitioners in California is proper because of their intentional conduct in Florida cal-

culated to cause injury ... in California." *Calder*, 465 U.S. at 791, 104 S.Ct. 1482.

Where a forum state seeks specific personal jurisdiction over a non-resident defendant, due process is satisfied if "the defendant has 'purposely directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Wessels, Arnold & Henderson v. National Med. Waste, Inc.*, 65 F.3d 1427, 1432 (8th Cir.1995) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Thus, if nonresidents "purposefully directed their activities towards North Dakota," a North Dakota court may be justified in exercising personal jurisdiction over them. *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 375 (8th Cir.1990).

[¶ 20] Rodenburgs summarized in their brief Parker's role in supplying the gun with which Hart shot Clifton Rodenburg:

After Hart had been released on bail in Iowa, Hart told Iowa Defendants Amelia Oponski and Mark Lathrop that he wanted to return to North Dakota to collect a debt and that he needed a gun for this venture. Defendant Patrick Parker supplied them with a .357 magnum weapon, a shoulder holster, and fifty rounds of hollow point ammunition, believing that they intended to use the weapon in an attempt to obtain money from North Dakota residents in North Dakota. [Second Amended Complaint, ¶ 28–30, 39, App. 54–55, 56; Tr. of Proc. 8/24/98, 66–67, 80; App. 87–88, 101]. Parker admitted that he gave the gun to Lathrop, knowing he would be going to North Dakota with Hart to get money. [Tr. of Proc. 8/24/98; 66, App. 87]. Parker admitted he knew that Hart had just been bailed out of jail by Lathrop.

[Parker Dep. p. 28, App. 171]. Parker knew Hart had been in trouble with law enforcement in the Des Moines area. [Rodenburg Aff. ¶ 15, App. 73]. Lathrop and Oponski transported Hart and the weapon to North Dakota. [Second Amended Complaint, ¶ 28–30; App. 54–55].

Parker said in a deposition he gave the gun to Lathrop, who "was going to go to Fargo with Bill Hart, and Hart was going to pay him money that he owed him, and he wanted the gun for protection of the money on the way back."

[¶ 21] In supplying Oponski and Lathrop with a .357 magnum, a shoulder holster, and 50 rounds of ammunition to obtain money in North Dakota with Hart, whom Parker knew Lathrop had just bailed out of jail, Parker's conduct and connection with North Dakota were such that he reasonably should have anticipated being haled into court here. Clifton Rodenburg's injury in North Dakota was not fortuitous. Parker purposely directed his activities at North Dakota residents, Parker's conduct was calculated to cause injury in North Dakota, the litigation results from injuries arising out of Parker's activities, and the trial court's exercise of personal jurisdiction over him would comport with due process. We conclude the trial court could properly have exercised personal jurisdiction over Parker, and we reverse the judgment dismissing Rodenburgs' action against Parker without prejudice.

[¶ 22] Our conclusion the trial court could have exercised personal jurisdiction over Parker, however, does not require or warrant a new trial against the YMCA. The jury found the YMCA was not negligent. Rodenburgs have not shown how a trial with additional defendants would have led the jury to find the YMCA negligent.

Rodenburgs may choose to further pursue their action against Parker.

### III

[¶ 23] Rodenburgs contend the trial court erred in determining the jury must compare the negligence of the YMCA with the intentional tort of Hart.

[¶ 24] Section 32–03.2–01, N.D.C.C., provides, in part: "As used in this chapter, 'fault' includes acts or omissions that are in any measure negligent or reckless towards the person or property of the actor or others, or that subject a person to tort liability." Section 32–03.2–02, N.D.C.C., provides:

> Contributory fault does not bar recovery in an action by any person to recover damages for death or injury to person or property unless the fault was as great as the combined fault of all other persons who contributed to the injury, but any damages allowed must be diminished in proportion to the amount of contributing fault attributable to the person recovering. The court may, and when requested by any party, shall direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury. The court shall then reduce the amount of such damages in proportion to the amount of fault attributable to the person recovering. When two or more parties are found to have contributed to the injury, the liability of each party is several only, and is not joint, and each party is liable only for the amount of damages attributable to the percentage of fault of that party, except that any persons who act in concert in committing a tortious act or aid or encourage the act, or ratifies or adopts the act for their benefit, are jointly liable for all

damages attributable to their combined percentage of fault. Under this section, fault includes negligence, malpractice, absolute liability, dram shop liability, failure to warn, reckless or willful conduct, assumption of risk, misuse of product, failure to avoid injury, and product liability, including product liability involving negligence or strict liability or breach of warranty for product defect.

[¶ 25] The modified comparative fault provisions significantly revised tort liability in North Dakota and shifted the focus from traditional tort doctrines to the singular inclusive concept of "fault." *Haff v. Hettich,* 1999 ND 94, ¶ 14, 593 N.W.2d 383. Section 32–03.2–02, N.D.C.C., directs comparison of "fault," rather than comparison of "negligence," and it includes within "fault" both "negligence" and "reckless or willful conduct." *McLean v. Kirby Co.,* 490 N.W.2d 229, 244 (N.D.1992). As this court said in *Champagne v. United States,* 513 N.W.2d 75, 79 (N.D.1994), under N.D.C.C. § 32–03.2–02, " 'Fault' now includes an intentional act." In N.D.C.C. § 32–03.2–02, the legislature clearly intended to replace joint and several liability with several allocation of damages among those who commit torts in proportion to the fault of those who contributed to an injury. *Hurt v. Freeland,* 1999 ND 12, ¶ 20, 589 N.W.2d 551; *Stewart v. Ryan,* 520 N.W.2d 39, 45 (N.D.1994).

[¶ 26] Under N.D.C.C. §§ 32–03.2–01 and 32–03.2–02, as this Court has construed them, "fault" includes negligent and intentional conduct. A negligent tortfeasor's conduct is compared with an intentional tortfeasor's conduct, and their liability is several, not joint, with each being liable only for the amount of damages attributable to that party. "We presume the legislature is aware of judicial construction of a statute, and from its failure to amend a particular statutory provision, we may presume it acquiesces in that construction." *Johnson v. Johnson,* 527 N.W.2d 663, 666 (N.D.1995). The legislature's failure to amend language interpreted by the courts "is evidence the court's interpretation is in accordance with the legislative intent." *Clarys v. Ford Motor Co.,* 1999 ND 72, ¶ 16, 592 N.W.2d 573.

[¶ 27] Rodenburgs assert public policy supports not relieving a negligent tortfeasor of liability for an intentional tortfeasor's fault when the negligent tortfeasor had a duty to prevent the intentional tort and the statutes should not be construed to include intentional torts or negligent tortfeasors should be jointly liable under the "aid or encourage" exception. The court in *Turner v. Jordan,* 957 S.W.2d 815, 823 (Tenn.1997), articulated the concerns in choosing to compare or not compare the fault of a negligent tortfeasor with that of an intentional tortfeasor:

Accordingly, the concern in cases that compare the negligence of a defendant with the intentional act of a third party is not burdening the negligent tortfeasor with liability in excess of his or her fault; conversely, the primary concern in those cases that do not compare is that the plaintiff not be penalized by allowing the negligent party to use the intentional act it had a duty to prevent to reduce its liability.

[¶ 28] A number of courts and commentators have expressed views which might reasonably lead to a decision not to compare intentional and negligent conduct in allocating fault. *See, e.g.,* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts,* § 65, p. 462 (5th ed.1984) (conduct "actually intended to inflict harm" and "that aggravated form of negligence, approaching intent ... differ[ ] from negligence not only in degree but in kind, and in the social condemnation attached to it"); *Wal–Mart Stores, Inc. v. McDonald,* 676

So.2d 12, 22 (Fla.Ct.App.1996) ("Reducing the responsibility of a negligent tortfeasor by allowing that tortfeasor to place the blame entirely or largely on the intentional wrongdoer would serve as a disincentive for the negligent tortfeasor to meet its duty to provide reasonable care to prevent intentional harm from occurring."); *Veazey v. Elmwood Plantation Assocs., Ltd.,* 650 So.2d 712, 719 (La.1994) ("any rational juror will apportion the lion's share of the fault to the intentional tortfeasor when instructed to compare the fault of a negligent tortfeasor and an intentional tortfeasor"); *Turner v. Jordan,* 957 S.W.2d at 823 ("[C]omparison presents practical difficulties in allocating fault between negligent and intentional acts, because negligent and intentional torts are different in degree, in kind, and in society's view of the relative culpability of each act."); *Brandon v. County of Richardson,* 261 Neb. 636, 624 N.W.2d 604, 620 (2001) ("Fact finders are likely to allocate most, if not all, of the damages to the intentional tort-feasor due to the higher degree of social condemnation attached to intentional, as opposed to negligent, torts."); *McLean v. Kirby Co.,* 490 N.W.2d at 244 (decided under prior law) (not fair or just for rape victim's recovery to be diminished by fault a jury might attribute to the rapist, who did not appear in the action and was in the plaintiff's apartment on behalf of the defendants and as a result of their negligence).

▮ [¶ 29] While good arguments can be made for not comparing the fault of a negligent tortfeasor with that of an intentional tortfeasor, such arguments would be more appropriately addressed to the legislature than to the judiciary. In N.D.C.C. §§ 32–03.2–01 and 32–03.2–02, the legislature chose to compare the fault of each. "Our function is to interpret the statute.... 'The justice, wisdom, necessity, utility and expediency of legislation are questions for legislative, and not for judicial determination.'" *Stokka v. Cass County Elec. Coop., Inc.,* 373 N.W.2d 911, 914 (N.D.1985) (quoting Syllabus ¶ 11, *Asbury Hospital v. Cass County,* 72 N.D. 359, 7 N.W.2d 438 (1943)). The legislature is much better suited than courts to identify or set the public policy in this state. *Haff v. Hettich,* 1999 ND 94, ¶ 22, 593 N.W.2d 383; *Martin v. Allianz Life Ins. Co.,* 1998 ND 8, ¶ 20, 573 N.W.2d 823. "[T]he legislature 'can do studies, gather evidence, hold hearings, and come to a decision' and 'broad public policy issues are best handled by legislatures with their comprehensive machinery for public input and debate' (citations and quotations omitted)." *Allianz,* 1998 ND 8, ¶ 20, 573 N.W.2d 823.

[¶ 30] We conclude the trial court did not err in determining the jury must compare the negligence, if any, of the YMCA with the intentional tort of Hart.

## IV

[¶ 31] The judgment dismissing Rodenburgs' action against Parker is reversed. The judgment dismissing Rodenburgs' complaint against the YMCA, and all other challenged rulings are affirmed.

[¶ 32] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM and WILLIAM A. NEUMANN, JJ., and MAURICE R. HUNKE, S.J., concur.

[¶ 33] The Honorable MAURICE R. HUNKE, S.J., sitting in place of MARING, J., disqualified.