2005 ND 120

**Michael BEAUDOIN, Plaintiff and Appellee**

v.

**SOUTH TEXAS BLOOD & TISSUE CENTER, Defendant and Appellant.**

**No. 20040356.**

Supreme Court of North Dakota.

June 24, 2005.

Kay Nord Hunt (argued) and Robert J. King, Jr. (on brief), Lommen Nelson Law Firm, Minneapolis, MN, and Orell D. Schmitz (appeared), Schmitz & Schmidt, Bismarck, ND, for plaintiff and appellee.

Michael T. Andrews (argued) and H. Patrick Weir (on brief), Vogel Law Firm, Bismarck, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1]   South Texas Blood & Tissue Center ("South Texas") appealed a memorandum opinion and order denying its motions to dismiss for lack of personal jurisdiction and to vacate a default judgment. We affirm the trial court's denial of the motion to dismiss for lack of personal jurisdiction, but we reverse the trial court's denial of the motion to vacate the default judgment and remand the case to the trial court.

[¶ 2]   Michael Beaudoin had his right patella tendon surgically replaced in Dickinson, North Dakota, with a tendon removed from a cadaver in Texas. At the request of a Connecticut corporation, Allograft.com, South Texas shipped the tendon to Dickinson. Beaudoin sued South Texas, alleging the tendon was not sterile, and that, as a result, he contracted an infection in his right knee. South Texas initially failed to respond to the suit, and the district court issued a default judgment for Beaudoin. A dispute regarding service of process arose, and we resolved that matter in *Beaudoin v. South Texas Blood & Tissue Center*, 2004 ND 49, 676 N.W.2d 103. Specifically, we held the professional process server's delivery of the summons and complaint to South Texas's Executive Office Manager, who had been identified as one authorized to accept such documents and appeared to be of sufficient character and rank to make it reasonably certain that South Texas would be apprised of the service, constituted valid service of process under N.D.R.Civ.P. 4(d). *Id.* at ¶ 18. After remand, the district court denied South Texas's motion to dismiss the suit for lack of personal jurisdiction. The district court also denied South Texas's motion to vacate the default judgment and to allow South Texas to respond to Beaudoin's substantive allegations. The two questions raised in the present appeal are whether the district court has personal jurisdiction over South Texas and whether the district court erred in refusing to vacate the default judgment.

I.

[¶ 3]   South Texas argues the district court does not have personal jurisdiction over it. South Texas asserts its constitutional, due-process rights would be violated by requiring it to defend against this suit in North Dakota. South Texas contends it does not have sufficient minimum contacts with the State and that, as a result, maintenance of this suit would be inconsistent with traditional notions of fair play and substantial justice.

A.

[¶ 4]   South Texas highlights many facts militating against its amenability to suit in North Dakota. South Texas points out it has never maintained a place of business in North Dakota, it has never maintained offices in North Dakota, it has never stored inventory in North Dakota, it has never held bank accounts in North Dakota, it has never owned real estate in North Dakota, it has never kept personal property in North Dakota, it has never had employees in North Dakota, its employees do not travel to North Dakota, it has never acquired tissue within North Dakota, it has never processed tissue within North Dakota, it has never solicited business in North Dakota, it has never advertised in North Dakota, and it has never sent promotional materials to North Dakota.

[¶ 5]   What South Texas does do, however, is to ship tissue components to places outside Texas. Prior to the shipment of Beaudoin's order of two patella tendons on July 3, 2000, South Texas shipped patella tendons to both St. Joseph's Hospital, the North Dakota hospital at which Beaudoin's surgery occurred, and the Minot Air Force

Base in North Dakota. St. Joseph's Hospital placed orders on May 30, 2000, and June 19, 2000, and obtained five patella tendons. The Minot Air Force Base placed 19 orders from June 2, 1998, to June 12, 2000, and obtained 23 patella tendons. South Texas continued to ship patella tendons to both of these entities after Beaudoin's surgery.

[¶ 6] When South Texas sends components out of state, it does so with the assistance of third-party distributors. South Texas does not directly contract with, or sell blood and tissue components to, medical facilities, physicians, or patients. Rather, South Texas is contacted by distributors who field requests from medical facilities and physicians. The distributors proceed to act as intermediaries between the requesting party and South Texas. South Texas frequently ships its components directly to the end user for logistical and health reasons, and these shipments are received by representatives of the distributing intermediaries. When preparing an order for packing and shipping, South Texas generates a Tissue Order form that contains South Texas's contact information. South Texas further includes a Patient Usage Feedback Request form for tracking purposes, and this form also contains South Texas's contact information.

[¶ 7] South Texas is entirely independent of the Connecticut-based intermediary at issue in this matter, Allograft.com. South Texas does not control Allograft.com's distribution system. Further, South Texas was not aware the harvested tendon was to be sent to North Dakota until the day it received the shipment directive from Allograft.com. South Texas was not paid by St. Joseph's Hospital, but by Allograft.com. South Texas had no contractual relationship with St. Joseph's Hospital, any North Dakota physicians, or Beaudoin.

[¶ 8] South Texas believes its contacts with North Dakota were random and fortuitous and the result of the unilateral activity of Allograft.com and St. Joseph's Hospital.

B.

[¶ 9] In the recent case of *Ensign v. Bank of Baker*, 2004 ND 56, 676 N.W.2d 786, we discussed the requirements for personal jurisdiction:

Whether a court maintains personal jurisdiction over a party is a question of law, and we review the district court's decision on the matter by employing the de novo standard for legal conclusions and the clear-error standard for factual findings. *Rodenburg [v. Fargo–Moorhead YMCA* ], 2001 ND 139, ¶ 17, 632 N.W.2d 407. Once a defendant has challenged a court's jurisdiction, the plaintiff bears the burden of proving that jurisdiction exists. *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 373 (8th Cir.1990); *Red River Transp. and Dev. Co., Inc. v. Custom Airmotive, Inc.*, 497 F.Supp. 425, 427 (D.N.D.1980). The plaintiff must make a prima facie showing of jurisdiction to defeat a motion to dismiss for lack of personal jurisdiction, and if the court relies only on pleadings and affidavits, the court must look at the facts in the light most favorable to the plaintiff. *Rodenburg*, at ¶ 17. Questions of personal jurisdiction must be decided on a case-by-case basis, depending on the particular facts and circumstances. *Catlin v. Catlin*, 494 N.W.2d 581, 590 (N.D.1992).

. . . .

"A court has personal jurisdiction over a person if the person has reasonable notice that an action has been brought and sufficient connection with the forum

state to make it fair to require defense of the action in the state." [*Larson v. Dunn*, 474 N.W.2d 34, 38–39 (N.D. 1991)]. In determining personal jurisdiction over a nonresident defendant, a court must first decide whether the forum state's long-arm provision confers jurisdiction over the nonresident defendant, and, if it does, the court must decide whether the exercise of personal jurisdiction over the nonresident comports with due process. *Rodenburg v. Fargo–Moorhead YMCA*, 2001 ND 139, ¶ 15, 632 N.W.2d 407. To satisfy due process concerns, the nonresident defendant must have sufficient minimum contacts with North Dakota so the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *Hansen v. Scott*, 2002 ND 101, ¶ 16, 645 N.W.2d 223.

*Id.* at ¶¶ 11, 9.

■ [¶ 10] North Dakota's long-arm provision is N.D.R.Civ.P. 4(b), which provides:

(2) Personal Jurisdiction Based Upon Contacts. A court of this state may exercise personal jurisdiction over a person who acts directly or by an agent as to any claim for relief arising from the person's having such contact with this state that the exercise of personal jurisdiction over the person does not offend against traditional notions of justice or fair play or the due process of law, under one or more of the following circumstances:

(A) transacting any business in this state;

(B) contracting to supply or supplying service, goods, or other things in this state;

(C) committing a tort within or without this state causing injury to another person or property within this state;

(D) committing a tort within this state, causing injury to another person or property within or without this state;

. . . .

(H) enjoying any other legal status or capacity within this state;

. . . .

(3) Limitation on Jurisdiction Based Upon Contacts. If jurisdiction over a person is based solely upon paragraph (2) of this subdivision, only a claim for relief arising from bases enumerated therein may be asserted against that person.

North Dakota's long-arm provision is "designed to permit the state courts to exercise personal jurisdiction to the fullest extent permitted by due process." *Hebron Brick Co. v. Robinson Brick & Tile Co.*, 234 N.W.2d 250, 255 (N.D.1975).

[¶ 11] As the *Ensign* Court continued:

We have identified five factors for assessing personal jurisdiction over a nonresident defendant: (1) the nature and quality of a nonresident defendant's contacts with the forum state; (2) the quantity of the nonresident defendant's contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the forum state's interest in providing a forum for its residents; and (5) the convenience of the parties. *Hansen*, 2002 ND 101, ¶ 30, 645 N.W.2d 223; *Lumber Mart, Inc. v. Haas Intern. Sales & Service*, 269 N.W.2d 83, 88 (N.D.1978). While the first three factors are of primary concern, the fourth and fifth factors are of only secondary importance and are not determinative. *Lumber Mart, Inc.*, at 88; *see also Guinness Imp. Co. v. Mark VII Distrib., Inc.*, 153 F.3d 607, 614 (8th Cir. 1998). [The third factor draws a distinction as to whether the jurisdiction is

specific or general. *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102–03 (8th Cir.1996).].

In *Lakin v. Prudential Sec.,* 348 F.3d 704, 707 (8th Cir.2003), the Eighth Circuit Court of Appeals explained:

> The Supreme Court has noted that states exercise two broad types of personal jurisdiction: specific jurisdiction and general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction refers to jurisdiction over causes of action that "arise out of" or "relate to" a defendant's activities within a state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). General jurisdiction, "on the other hand, refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." *Sondergard* [*v. Miles, Inc.,* 985 F.2d 1389, 1392 (8th Cir.1993) ] (citation omitted); *see also Helicopteros,* 466 U.S. at 414 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404.

General personal jurisdiction is proper only when the defendant has engaged in a high level of continuous and systematic contacts in the forum state. *See Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1362 (5th Cir.1990). Because of the broad basis for jurisdiction and the requirement of a much higher level of contacts, the exercise of general personal jurisdiction "is typically limited to large companies doing a large amount of business on a regular basis." *Adams v. Riverview Healthcare Ass'n,* No. A3–02–135, 2003 WL 1456442, [at *2,] 2003 U.S. Dist. LEXIS 4253, at * 5 (D.N.D. March 17, 2003). Most courts are hesitant to exercise general personal jurisdiction

over nonresident defendants. *Lakin,* 348 F.3d at 708.

. . . .

A North Dakota court may exercise specific personal jurisdiction over nonresident defendants only if they " 'purposefully directed their activities towards North Dakota,' " *Rodenburg,* 2001 ND 139, ¶ 19, 632 N.W.2d 407 (quoting *Falkirk Mining Co.,* 906 F.2d at 375), and the course of action "arise[s] out of" or "relate[s] to" the defendant's activities in the state. *Lakin,* 348 F.3d at 707.

*Ensign,* at ¶¶ 12–13, 15.

▮▮▮ [¶ 12] The mere likelihood or foreseeability that a product will find its way into a state is insufficient to ground personal jurisdiction. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Rather, the foreseeability that is critical is "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* In seeking to define when a defendant should "reasonably anticipate" out-of-state litigation, the U.S. Supreme Court has relied on the language of *Hanson v. Denckla:*

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (discussed in *Burger King Corp. v. Rudzewicz,*

471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Further:

> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475–76, 105 S.Ct. 2174 (internal citations omitted) (emphasis in original).

### C.

[¶ 13] Although the facts supporting the exercise of personal jurisdiction over South Texas are not overwhelming, they are nonetheless present. We initially note the complaint, which alleged both negligence and warranty claims, is sufficient to satisfy North Dakota's long-arm provision. *See* N.D.R.Civ.P. 4(b)(2) (discussing claims involving torts and the supplying of goods and services in North Dakota). The more difficult question is of course whether the exercise of personal jurisdiction over South Texas comports with due process.

[¶ 14] South Texas's contacts with North Dakota are neither sufficiently con-

tinuous nor systematic to justify the exercise of general personal jurisdiction. *See Lakin v. Prudential Sec.*, 348 F.3d 704, 707–08 (8th Cir.2003). Rather, the relevant questions are whether South Texas has sufficient minimum contacts with North Dakota, whether Beaudoin's cause of action arises out of or is related to these contacts, and whether South Texas purposefully directed its activities toward the State.

[¶ 15] As a threshold matter, South Texas argues its "other" shipments of patella tendons to North Dakota cannot be invoked to establish specific personal jurisdiction in this case. We disagree. A plaintiff's cause of action must either "arise out of" or "relate to" the defendant's activities in the forum State. Here, South Texas shipped patella tendons, the tissue component used in Beaudoin's surgery, to both St. Joseph's Hospital and the Minot Air Force Base in the months and years preceding Beaudoin's order. Although these other shipments were not the proximate cause of Beaudoin's alleged injury, Beaudoin's cause of action alleging a defect in his patella tendon does "arise out of" the process through which South Texas's components arrive in North Dakota. And, at the very least, these orders are certainly "related to" a cause of action alleging a defect in one such tendon.

[¶ 16] By contrast, the case of *Ensign v. Bank of Baker*, 2004 ND 56, 676 N.W.2d 786, supports our view of South Texas's other shipments of patella tendons to North Dakota. Although *Ensign* stands for the proposition that unrelated contacts cannot be invoked to establish specific personal jurisdiction, here the contacts are related. In *Ensign*, Ensign sued the Bank of Baker, a Montana bank, to determine priority between an agricultural supplier's lien and the Bank's security interest in a herd of livestock. *Id.* at ¶¶ 2–6. In re-

sponse to the Bank's objection to the North Dakota court's exercise of personal jurisdiction, Ensign argued, in part, that personal jurisdiction was proper because the Bank made loans to North Dakota customers. *Id.* at ¶ 15. We noted Ensign was not a Bank customer and that the underlying debtors in the case were not North Dakota residents. *Id.* at ¶ 16. We concluded that Ensign's action to determine lien priority and obtain a money judgment from the Bank was "totally unrelated to the loans made to other North Dakotans." *Id.* The unique facts of *Ensign* do not stand for the proposition that a cause of action alleging a defect in a tissue component does not "arise out of" or "relate to" recent activities undertaken by the defendant to supply the same tissue component to the forum State.

[¶ 17] Examining the quantity, nature, and quality of South Texas's contacts with North Dakota, we are convinced that subjecting South Texas to the personal jurisdiction of the North Dakota courts is proper in this matter. While we refrain from overtly quantifying our analysis, we note South Texas has not merely shipped one or two components to North Dakota, although the U.S. Supreme Court has stated that "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Rather, South Texas shipped 28 patella tendons to North Dakota during the approximately two years preceding Beaudoin's surgery. South Texas argues these North Dakota shipments, when compared to its shipments to other locales, are "infinitesimal" and "microscopic." These mathematical comparisons may be sound, but we do not believe they guide the law of personal jurisdiction. If such an analysis were adopted, states with smaller popula-

tions, such as North Dakota, would always be at a legal disadvantage compared to states with greater populations and larger economic markets. Simply because a State does not account for a proportionately high level of a company's orders or revenues does not foreclose a finding that the company has sufficient minimum contacts with the forum State to ground personal jurisdiction.

[¶ 18] Regarding the nature and quality of these activities, South Texas argues its contacts with North Dakota have been random, fortuitous, and the result of the unilateral activity of third parties, here Allograft.com and St. Joseph's Hospital. This argument has some initial appeal, but it fails closer scrutiny. South Texas essentially argues it should be shielded from personal jurisdiction in North Dakota because its various distributors arrange the terms and conditions of the sales made to hospitals, physicians, and end users. This argument fails to address a central fact we view to be dispositive: South Texas does not blindly ship tissue components to its autonomous distributors with no awareness or expectation of where these components will ultimately come to rest; rather, South Texas typically maintains physical control of its components until they are directly shipped to the patient's location, as was the case here.

[¶ 19] South Texas asserts it maintains physical control over its components merely for health and logistical reasons. South Texas points out it does not know where these components are destined to be sent until immediately prior to shipment. These statements may be true, but the autonomy South Texas heralds between itself and its distributors is a double-edged sword. Even though the distributors may act independently in developing potential business transactions, South Texas is not bound to ratify the actions of its distribu-

tors. Instead, because South Texas fails to relinquish physical control over its products until final shipment, the company, regardless of the reasons for maintaining such control, reserves the ultimate freedom to assume or reject any proposal from its independent distributors. When a proposal from a distributor is presented to South Texas, the company, who at that point is aware of the end-user's location, makes a conscious decision whether it wants to complete the transaction and serve the end-user's market. In *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Supreme Court explained why it is just to ground personal jurisdiction in these types of situations:

> When a corporation purposefully avails itself of the privilege of conducting activities within the forum State, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

*Id.* at 297–98, 100 S.Ct. 559 (internal quotations and citations omitted).

[¶ 20] Having made the choice to serve the North Dakota medical market 21 times, resulting in the shipment of 28 patella tendons during the two years preceding Beaudoin's surgery, we conclude South Texas has purposefully directed its activities toward North Dakota. Accordingly, we believe it erroneous for South Texas to claim its products arrived in North Dakota via random or fortuitous events or the unilateral activity of others. A North Dakota lawsuit arising out of or, at the very least, relating to these shipments of patella tendons does not offend traditional notions of fair play and substantial justice. And, given South Texas's deliberate conduct and connection with North Dakota, the company should reasonably anticipate being haled into a North Dakota court to defend against an alleged defect in one of its products.

[¶ 21] We also note that, in making the decision to serve an end user, South Texas is aware that its Tissue Order form and Patient Usage Feedback Request form will be included with its shipped order. Both of these forms contain South Texas's contact information. The Patient Usage Feedback Request form places a minimal reporting burden on the end user, physician, or hospital in the forum State and, far more significantly, raises the specter of a continuing relationship between South Texas and the forum State in the event questions or medical complications develop. *Cf. Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 94 L.Ed. 1154 (1950) (noting, in the context of an interstate contractual obligation, that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" can be subject to "the jurisdiction of regulatory agencies in the latter state"). That this form is an "industry requirement" does not lessen the potential relationship. Although not critical to our resolution of this case, these forms nonetheless demonstrate that South Texas held itself out to the end users of its products, and, when viewed in light of the arguments discussed above, support the conclusion that South Texas has sufficient minimum contacts with

North Dakota and purposefully directed its activities toward the State.

[¶ 22] Cases from other jurisdictions cited in support of South Texas's arguments are distinguishable. In *State ex rel. Wichita Falls General Hospital v. Adolf*, 728 S.W.2d 604 (Mo.Ct.App.1987), a Texas hospital notified an information clearinghouse as to the availability of a heart suitable for transplant. *Id.* at 605–06. The clearinghouse then notified a Missouri hospital and doctor regarding the availability of the heart. *Id.* at 606. The Missouri doctor contacted the Texas hospital, which served to notify the Texas hospital that the ultimate destination of the heart would be Missouri. *Id.* The Missouri doctor traveled to Texas with a transplant team and proceeded to harvest the organ. *Id.* Complications with the heart transplant ensued, and the family of the Missouri heart-transplant patient sued the Texas hospital in Missouri's court system. *Id.* The Texas hospital moved to dismiss the suit for lack of personal jurisdiction, and the appellate court ultimately granted the Texas hospital relief. *Id.* at 606, 609.

[¶ 23] Admittedly, there are many facts that unite our case and *Wichita Falls*. The Texas hospital initiated no contact with Missouri. *Id.* at 609. Rather, the initial contact was between the clearinghouse and the Missouri hospital and doctor. *Id.* And, before the harvesting occurred, the Texas hospital learned the heart would be destined for Missouri. *Id.* at 606. Similarly, South Texas did not, in the first instance, initiate contact with North Dakota. Rather, initial contact was between Allograft.com and North Dakota. Further, before shipping the patella tendon, South Texas learned that the order was destined for North Dakota.

[¶ 24] Despite these factual similarities, we believe the tenor of these two cases is unique. The Texas hospital in *Wichita*

*Falls* was not in the business of soliciting donor organs for distribution. *Id.* at 609. Rather, fueled by humanitarian concerns, the Texas hospital would contact a clearinghouse if a donor organ happened to become available. *Id.* at 606. Here, South Texas is primarily in the business of acquiring and supplying blood and tissue products. Even though South Texas is a 501(c)(3), non-profit organization, presumably it must by necessity make enough return on its activities to meet its actual operating costs. The harvesting, preparation, and shipment, which included South Texas's contact information, were completed as a part of South Texas's regular course of business. These activities are all hallmarks of a commercial actor purposefully directing its services and products to a forum State. In *Wichita Falls*, however, the Texas hospital's actions were not deemed a commercial activity because it failed to recoup its actual costs in the heart transaction, and in fact sustained an overall financial loss as a result of its involvement in the organ-donor program. *Id.* at 609.

[¶ 25] Also, the record demonstrated no history of contact between the Texas hospital and Missouri in *Wichita Falls*. *Id.* at 609. In our case, as we have noted, there is a detailed history of related contacts between South Texas and North Dakota.

[¶ 26] In *Wichita Falls*, although the Missouri hospital and doctor did work through the clearinghouse initially, it was the Missouri doctor who initiated contact with the Texas hospital and who, significantly, flew to Texas to personally harvest the organ. *Id.* at 606. The Texas hospital can thus be seen as a relatively passive actor. In our case, however, despite both South Texas and Beaudoin relying on Allograft.com to help initially structure and facilitate the transaction, it was South Tex-

as that chose to consummate the deal by shipping the patella tendon to North Dakota, an affirmative, active, and direct contact with the State.

[¶ 27] The similarities between *Wichita Falls* and the present case notwithstanding, we believe these important differences reinforce why questions of personal jurisdiction must be decided on a case-by-case basis, depending on the particular facts and circumstances presented. *Catlin v. Catlin*, 494 N.W.2d 581, 590 (N.D.1992).

[¶ 28] Many of the other cases cited by South Texas revolve around the stream-of-commerce theory of personal jurisdiction. The stream-of-commerce theory is often traced to Justice White's statement that "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see also Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761, 766 (1961) (noting that although a manufacturer working through intermediaries derives only an indirect benefit from a forum-State's laws, this indirect benefit is nonetheless essential to the manufacturer's business and can ground personal jurisdiction). On its face, this statement would cut against South Texas's claims. Even if South Texas "delivered" its products into the stream of commerce through its distributors, South Texas cannot argue it did not "expect" its

products would be purchased by North Dakota consumers because South Texas had actual knowledge its products were headed to North Dakota before any shipments were made.

[¶ 29] Rather, South Texas appears to rely on the subsequent Supreme Court decision of *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), to support its contention. In *Asahi*, four members of the Supreme Court held that, in addition to merely placing a product in the stream of commerce with the expectation it will be purchased by consumers in the forum State, there must also be a finding the defendant purposefully directed its activities toward the forum State in order to establish personal jurisdiction. *Id.* at 112, 107 S.Ct. 1026. Assuming this additional requirement is good law,[1] we have already decided that South Texas purposefully directed its activities toward North Dakota when it made the conscious decision to serve the North Dakota market for patella tendons. Therefore, any argument South Texas advances based on cases utilizing a heightened stream-of-commerce theory must fail.

## II.

[¶ 30] South Texas argues the district court erred in refusing to vacate the default judgment under N.D.R.Civ.P. 60(b)(i), which would have allowed South Texas to respond to Beaudoin's complaint. South Texas notes N.D.R.Civ.P. 60(b)(i) is to be liberally construed and applied, decisions on the merits are preferable to those

---

1. In *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550 n. 2 (7th Cir.2004), the Circuit Court of Appeals noted the Supreme Court's decision in *Asahi* "left open the question whether a plaintiff making a stream-of-commerce argument needs to make an additional showing that the defendant purposefully directed its business activities toward the forum state." *Asahi's* two concurring opinions, which reflected the views of five Justices, either explicitly rejected the additional requirement of purposeful direction or stated that the issue should not have been reached.

by default, and that it sought timely relief from the default judgment and interposed meritorious defenses. South Texas also argues its initial failure to appear and defend was due to an inadvertent mistake, namely a misplacement of the summons and complaint.

### A.

[¶ 31] As we previously described in *Beaudoin v. South Texas Blood & Tissue Center*, 2004 ND 49, ¶ 3, 676 N.W.2d 103, a professional process server served Beaudoin's summons and complaint on South Texas at its headquarters in San Antonio, Texas, on August 19, 2002. South Texas's Executive Office Manager, Betty Nickerson, accepted the documents. Nickerson then submitted the papers to Norman D. Kalmin, M.D., South Texas's President/CEO and Medical Director. Kalmin turned the summons and complaint over to Mary Beth Fisk, Vice President of Tissue Services. Fisk sent a copy of the papers to Donna Respondek, Vice President of Financial Services, requesting that Respondek file a claim with their insurance company. Respondek was on vacation at the time, and the copy of the summons and complaint was accidentally misfiled in the Financial Services Department. The company took no further action. This went undiscovered until January 8, 2003, when a call was received from Beaudoin's attorney informing South Texas of the default judgment.

### B.

[¶ 32] Rule 60, N.D.R.Civ.P., provides, in part:

(b) Mistakes–Inadvertence–Excusable Neglect–Newly Discovered Evidence–Fraud–Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment or order in any action or proceeding for the following reasons: (i) mistake, inadvertence, surprise, or excusable neglect; . . . or (vi) any other reason justifying relief from the operation of the judgment.

[¶ 33] This Court has stated the following regarding N.D.R.Civ.P. 60:

A motion to vacate a judgment under N.D.R.Civ.P. 60(b)(i) lies within the sound discretion of the trial court, and its decision will not be disturbed on appeal unless the court has abused its discretion. An abuse of discretion by the trial court is never assumed; the burden is on the party seeking relief to affirmatively establish it. The trial court abuses its discretion only when it acts in an arbitrary, unreasonable, or unconscionable manner. A trial court acts in an arbitrary, unreasonable, or unconscionable manner when its decision is not the product of a rational mental process by which the facts and law relied upon are stated and considered together for the purpose of achieving a reasoned and reasonable determination. We will not overturn the trial court's decision merely because it is not the one we may have made if we were deciding the motion.

This Court has emphasized that N.D.R.Civ.P. 60(b) is to be liberally construed and applied, and trial courts should be more lenient in granting motions to vacate default judgments than in vacating judgments in cases which have been tried on their merits. The relevant factors were summarized in *CUNA Mortgage v. Aafedt*, 459 N.W.2d 801, 803 (N.D.1990) (citations omitted):

This court has long encouraged trial courts to be more lenient when entertaining Rule 60(b) motions to vacate default judgments as distinguished from "litigated" judgments, that is, judgments entered after trial on the

merits. While a trial court certainly has discretion to grant or deny a Rule 60(b) motion to vacate a default judgment, the range of that discretion is limited by three important considerations. First, Rule 60(b) is remedial in nature and should be liberally construed and applied. Second, decisions on the merits are preferable to those by default. Third, as a consequence of the first two considerations, where timely relief is sought from a default judgment and the movant has a meritorious defense, doubt, if any, should be resolved in favor of the motion to set aside the judgment so that cases may be decided on their merits.

*Gepner v. Fujicolor Processing, Inc.*, 2001 ND 207, ¶¶ 13–14, 637 N.W.2d 681 (internal citations and quotations omitted); *see also Suburban Sales & Serv., Inc. v. District Court of Ramsey County*, 290 N.W.2d 247, 252 (N.D.1980) (noting that no cases were discovered in which our trial courts were held to have abused their discretion in vacating a judgment, but citing several occasions in which our trial courts abused their discretion in refusing to vacate a judgment under Rule 60(b)).

### C.

[¶ 34] In its opinion, the district court stated the following reasons for denying South Texas's motion to vacate the default judgment:

In the instant case, there is no question that the Defendant is equipped with a meritorious defense, and it is uncontested that they reacted to the default judgment as soon as was possible. Based upon [language similar to that included in Section B above], it would seem that vacating the judgment is the only option. However, our inquiry does not end there.

Although the Defendant has cited copious amounts of state and federal case law to support his contention that the corporation's misplacement of the summons and complaint constitutes excusable neglect and mistake, the Plaintiff has maintained throughout the action, that because the mistake and neglect was the Defendant's own, the Defendant should not be relieved from the default judgment. The Plaintiff's argument is very persuasive. A quick perusal of prior North Dakota decisions proves that in addition to the factors outlined above, the Court must also take into account *who* was responsible for the alleged mistake or neglect giving rise to the default.

In *CUNA [Mortgage v. Aafedt*, 459 N.W.2d 801, 803 (N.D.1990) ], the Court vacated the default judgment, but in doing so stated that "CUNA's failure to timely respond was the result of lawyer error, which we are reluctant to attribute to a client who has not been personally negligent." *Id.* It is evident, under the caveat expressed by the Supreme Court in *CUNA* (that negligence was not attributed to client) that neglect by the client himself would have been treated differently than the then-present neglect by legal representation.

Likewise, in *King v. Montz*, the Court again qualified its decision to vacate default judgment by saying, "that the defendant personally was not negligent in the protection of her interests seems clear from the facts recited. In situations such as are here disclosed, the courts have been reluctant to attribute to the parties the errors of their legal representatives." 219 N.W.2d 836, 839–840 (N.D.1974).

Indeed, many of the cases the Defendant cites to support vacating the default judgment, also include language similar to that described in both *Montz* and *CUNA*. [*See Gepner v. Fujicolor Processing, Inc.*, 2001 ND 207, 637

N.W.2d 681] ("We have also cautioned that, when the inadvertence or neglect has been committed by a party's attorney or insurer, we are reluctant to attribute the error to a client who was not personally responsible."); *First Fed. Sav. [&] Loan Ass'n v. Hulm*, 328 N.W.2d 837 (N.D.1982) ("In this case there is no assertion by Linda that her failure to make an appearance in the case prior to entry of the default judgment was the result of the neglect or other act of any third party.").

The treatment received under N.D.R.Civ.P. 60(b) depends not simply upon the timeliness of motion or merit of the defense, it also depends upon [whose] mistake or neglect leads to the subsequent default judgment. In the case at hand, the Defendant was fully capable of providing a response. Its failure to do so arose from its own negligence as to the filing of the documents. This Court finds that because the incidents leading to the default judgment are those for which the Defendant is personally responsible, the default judgment shall remain closed and final.

Similarly, the language of N.D.R.Civ.P. 60(b)(vi) is not persuasive. The Court in *In re Braun* stated:

> "This broad language gives the courts ample power to vacate judgments whenever such action is appropriate to accomplish justice. Of course, this power is not provided in order to relieve a party from free, calculated and deliberate choices he has made. The party remains under a duty to take legal steps to protect his interests. But if it is unjust that a judgment be enforced, Rule 60(b)(6), supra, provides an avenue for escape from the judgment[.]" 145 N.W.2d 482 (N.D.1966).

This Court finds again, because the Defendant was solely responsible for the negligence leading to default, it would be unwise to vacate the default decision. The Defendant's haphazard actions constitute "free, calculated and deliberate choices[,"] and therefore his motion to vacate the default judgment is, in all parts, denied.

[¶ 35] South Texas contends the district court misinterpreted N.D.R.Civ.P. 60(b)(i) when the district court undertook an analysis of who was responsible for the alleged mistake or neglect giving rise to the default and ultimately denied relief because it placed blame at the feet of South Texas. South Texas argues neither the rule nor our case law requires the mistake, inadvertence, surprise, or excusable neglect be that of a third party. We agree.

[¶ 36] Although the district court is correct in noting we are reluctant to attribute a third-party's errors to an innocent defendant, this fact does not foreclose N.D.R.Civ.P. 60(b)(i) relief when a defendant has personally erred. Beaudoin attempts to explain the district court's statements by arguing that the court did not engraft a requirement that the mistake, inadvertence, surprise, or excusable neglect be that of a third party, but simply "analyze[d] the excusable neglect requirement, in part, by considering cases where a [third party] committed the mistake or excusable neglect." We do not interpret the district court's statements in this light. The district court does arrive at the conclusion that South Texas's actions were the result of "free, calculated and deliberate choices," and such a statement could presumably reveal the district court's belief that South Texas's actions were not, from a factual standpoint, the result of mistake or excusable neglect. However, it is equally possible the district court simply

re-referenced this language to dispose of South Texas's argument under N.D.R.Civ.P. 60(b)(vi).

[¶ 37] Even if we assume the former explanation, this isolated sentence must be viewed in the context of the numerous pages of legal analysis from the district court indicating that a defendant's own errors are seemingly never an adequate basis for relief from a default judgment under N.D.R.Civ.P. 60(b). Our case law, which has frequently permitted relief from errors assignable to a defendant, does not support this conclusion. *See, e.g., U.S. Bank Nat'l Ass'n v. Arnold*, 2001 ND 130, ¶¶ 25–28, 631 N.W.2d 150 (denying the defendant Rule 60(b) relief, but discussing situations in which a defendant's depression and medical condition can lead to relief from a default judgment); *Red River State Bank v. Reierson*, 533 N.W.2d 683, 688–89 (N.D.1995) (finding of excusable neglect affirmed where party did not contact new, in-state counsel until shortly after the time for amending the judgment had expired); *Suburban Sales & Serv., Inc. v. District Court of Ramsey County*, 290 N.W.2d 247, 253–54 (N.D.1980) (Rule 60(b) relief partially based on defendant's mental depression stemming from automobile accident); *Sioux Falls Constr. Co. v. Dakota Flooring*, 109 N.W.2d 244 (N.D.1961) (defendant's inattention to suit due to wife's illness found to be excusable neglect); *see also* N.D.R.Civ.P. 60(b) (authorizing a district court to relieve "a party or a party's legal representative" from a final judgment or order); *cf. Wilj Int'l Ltd. v. BioChem ImmunoSystems, Inc.*, 4 F.Supp.2d 1, 7 (D.Mass.1998) (discussing identical language from the Federal Rules of Civil Procedure and concluding that "Fed.R.Civ.P. 60(b)(1) gives a court discretion, in the interest of justice, to relieve a party from the consequences of its own 'mistake, inadvertence, surprise, or excusable neglect.' ").

[¶ 38] Further, the district court failed to engage in a detailed, fact-based discussion to support a conclusion that South Texas's actions were not the result of mistake or excusable neglect. *Cf. U.S. Bank Nat'l Ass'n v. Arnold*, 2001 ND 130, ¶ 25, 631 N.W.2d 150 (district court failed to find excusable neglect after detailed examination and scrutiny of factual assertions made in defendant's affidavit). Rather, the district court seemed to base its conclusions on a narrow rather than a liberal reading of the requirements of N.D.R.Civ.P. 60(b)(i), if not an erroneous reading of these requirements. Therefore, the district court's conclusion, which is based on a belief that Rule 60(b)(i) relief is only appropriate when the error is attributable to a third party, misinterprets and misapplies our law and, accordingly, is an abuse of discretion. *See, e.g., Filler v. Bragg*, 1997 ND 24, ¶ 9, 559 N.W.2d 225 (stating that a misinterpretation or misapplication of the law constitutes an abuse of discretion).

[¶ 39] Rule 60(b) is remedial in nature and should be liberally construed and applied. Decisions on the merits are preferable to those by default. Further, the trial court itself noted "there is no question that the Defendant is equipped with a meritorious defense, and it is uncontested that they reacted to the default judgment as soon as was possible." Given these factors, the trial court's decision to deny South Texas's motion to vacate the default judgment based largely, if not exclusively, on a misinterpretation and misapplication of N.D.R.Civ.P. 60(b)(i), must be reversed as an abuse of the trial court's discretion.

[¶ 40] A defendant's own errors will not always constitute proper grounds for relief from a default judgment. The applicable standard under

N.D.R.Civ.P. 60(b)(i) remains "mistake, inadvertence, surprise, or excusable neglect." Nonetheless, where a trial court's application of this standard is guided by a misinterpretation and misapplication of our law, rather than a rigorous analysis of the facts, reversal of the trial court is the proper remedy.

[¶ 41]   We affirm the trial court's denial of the motion to dismiss for lack of personal jurisdiction, but we reverse the trial court's denial of the motion to vacate the default judgment and remand the case to the trial court.

[¶ 42] DALE V. SANDSTROM, MARY MUEHLEN MARING, JJ., and WILLIAM F. HODNY, S.J., concur.

[¶ 43] The Honorable WILLIAM F. HODNY, S.J., sitting in place of KAPSNER, J., disqualified.